Filed 6/23/14  P. v. Ramos CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROMEO RAMOS,<br><br>    Defendant and Appellant. | B242911<br><br>(Los Angeles County<br>Super. Ct. No. BA347866) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Monica Bachner, Judge.  Affirmed as modified.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Romeo Ramos of one count of attempted murder in violation of Penal Code sections 664 and 187, subdivision (a)[1] (count 1); four counts of assault with a deadly weapon upon a peace officer in violation of section 245, subdivision (c) (counts 2, 4, 6, and 7); one count of assault by means likely to produce great bodily injury in violation of section 245, subdivision (a)(1) (count 8); and one count of arson of an inhabited structure or property in violation of section 451, subdivision (b) (count 9). In count 1, the jury found true the allegation that the attempted murder was committed upon a peace officer and that defendant knew or reasonably should have known the victim was a peace officer engaged in the performance of his duties. In counts 1, 2, 4, 6, 7, and 8, the jury found true the allegation that defendant personally used a deadly weapon in the commission of the offense within the meaning of section 12022, subdivision (b)(1).

In count 1, the trial court sentenced defendant to life with the possibility of parole plus an additional term of one year for the deadly weapon allegation. In count 2, the court imposed the midterm of four years and one year for the deadly weapon allegation but stayed the sentence under section 654, since it constituted the same act as the offense in count 1. The court sentenced defendant in count 9, the base determinate term, to the midterm of five years to run consecutively to the one-year enhancement in count 1. In counts 4, 6, and 7, the court imposed the midterm of four years plus one year in each count for the use of a deadly weapon, to run concurrently to count 9. In count 8, the court imposed the midterm of three years plus an additional year for the deadly weapon use enhancement, to run concurrently to counts 4, 6, 7, and 9. The court ruled that the six-year determinate sentence was to be served prior to the indeterminate sentence in count 1.

Defendant appeals on the grounds that: (1) the trial court's failure to adjourn the jury trial to address the issue of defendant's competence violated both state procedure

---

[1]     All further references to statutes are to the Penal Code unless stated otherwise.

and defendant's state and federal constitutional rights to a fair trial and due process; (2) reversal is required because defendant was not competent during his trial; (3) reversal of the judgment is required and any attempt to remand in order to determine past competency is a violation of defendant's right to due process under the federal Constitution; (4) defendant was denied due process under the federal Constitution when he was forced to proceed to trial because he was not rationally able to evaluate the prosecution's plea offer; and (5) the one-year terms imposed for the personal use of a deadly weapon allegations in counts 2, 4, 6, 7, and 8 must be stricken.

## FACTS

### I. Facts Relating to the Crimes

#### A. Prosecution's Case-in-Chief

On October 15, 2008, mailman Frank Nguyen was delivering mail to the mailboxes located on the porch outside defendant's two-story apartment building on Rampart Boulevard. Nguyen had a certified letter for defendant. As he put mail in the boxes, Nguyen sensed that there was someone behind him. He turned around and saw defendant standing there. Nguyen handed a certified letter to defendant and asked him to sign the receipt. Defendant tore the return receipt card into pieces and threw the pieces at Nguyen's face. Nguyen believed defendant was "not normal." Nguyen told defendant, "Don't do that," and defendant "got angry." With his right fist, defendant hit the left side of Nguyen's face. Defendant then struck Nguyen in the head with a black object that felt like a rock. Nguyen jumped off the porch and ran back to his mail truck. Defendant followed Nguyen and challenged him to fight. Defendant asked Nguyen if he was going to call the police. When Nguyen reached his mail truck and saw defendant walking back to his apartment, he called his station and reported the incident.

Shortly thereafter, Nguyen saw a black-and-white patrol car approaching. Officer Ramon Guillen, and his partner, Officer Shane Bua, were transporting a patrol car from the old Rampart police station to a new station when they were flagged down by Nguyen. Nguyen told them what had occurred and gave them a description of his attacker. Officer Guillen was wearing a blue Polo shirt and black slacks. His gun and

3

badge were exposed. Officer Bua was dressed similarly and his gun and badge were also exposed.

Two of Nguyen's supervisors arrived and spoke with Nguyen and the police. Defendant came out of his building, and Nguyen identified him as his attacker. Officer Guillen, with his badge displayed, stood in front of the patrol car and spoke to defendant, who was approximately 30 feet away. Officer Guillen told defendant the officers needed to speak with him. Defendant walked toward Officer Guillen at the speed of a "power walk." Defendant brandished a knife as he moved toward Officer Guillen. Officer Guillen drew his gun and took two steps back when defendant was about seven or eight feet away. Defendant swung his knife at Officer Guillen in a large arc, and the blade came within three to five feet of the officer. Defendant then went back to his apartment building. As defendant retreated, Officer Guillen commanded him to stop and drop the knife. Defendant turned his head and growled at the officer. He then entered the building and began "flipping [Officer Guillen] off" from behind the glass door of his apartment building.

When more officers arrived, police evacuated defendant's apartment building. A perimeter was established, and a SWAT team was called in to assess the situation.

Officer Michael Messenger was the first member of the SWAT team to respond to the radio call. When all of the squad officers arrived, they removed their equipment, including tear gas and less lethal munitions, from the SWAT truck and proceeded to defendant's residence in an armored vehicle. For approximately eight hours, the SWAT team tried to convince defendant to surrender. They also prepared to subdue defendant using nonlethal force or lethal force, if necessary.

Officer Messenger saw defendant looking out of a second-story window. At one point, Officer Bruce Adam saw defendant masturbating in front of a large window. Defendant threatened the officers and was rambling and nonsensical at times. Although the police informed defendant by means of a loudspeaker that force would be used against him if he did not surrender, defendant stayed inside his residence.

4

The SWAT team formulated a plan to enter the building. SWAT Officers Steve Gordon, Officer Messenger, and his partner, Officer Adam, entered the building on the ground floor. They heard defendant shouting obscenities at them and saying, "If you come in here, I will kill you. I want your blood if you want my blood." One of the SWAT officers launched a tear gas canister up the stairs. Defendant did not respond. Next a "hot gas" canister, which is more concentrated than tear gas, was launched up the stairs. An officer using a loudspeaker repeatedly asked defendant to come out and told him they were not there to hurt him. At one point, defendant began to walk down the stairs, but he went back up the stairs when he saw Officer Messenger. Defendant then began throwing down objects, such as a vacuum cleaner, a wooden box, and a container of marbles. At one point, defendant threw a knife down the stairs. Officer Messenger heard the sound of the knife and saw it stick in the wooden box defendant had previously thrown down the stairs. Officer Adam was only "two feet or so" from the spot where the knife landed.[2] Defendant threw tissue paper with blood on it, and said, "Come upstairs and I'll see your blood."

SWAT team members used a mirror to observe the upstairs landing. Defendant threw things at the mirror and sprayed it with lighter fluid. Some of the fluid landed on the officers. Defendant then threw the can of charcoal lighter fluid down the stairs, and some of the fluid splashed on the officers.

Officer Messenger started to smell smoke and saw the reflection of flames on an upstairs wall. Four officers moved up the stairs and put out the fire. Because the officers could not see through the thick smoke, they backed down the stairs. The officers eventually climbed the stairs to the second story to an apartment where they believed defendant to be. Defendant was again asked to come out, but he did not. The officers forcibly opened the door and saw defendant hiding in the back of a closet. He was sticking his head out and he had two knives in his hand. The officers employed

---

[2]     Officer Adam was the named victim in the attempted murder charge in count 1.

additional nonlethal measures, including the firing of projectiles and use of a taser, to subdue defendant, and he was taken into custody.

Los Angeles City Fire Department Arson Investigator Leslie D. Wilkerson investigated the fire. He testified the fire in the apartment building was intentionally caused using an ignitable liquid, such as charcoal lighter fluid.

### B. Defense Evidence

Dr. Jack Rothberg, a board-certified psychiatrist and forensic examiner, examined defendant on December 5, 2008, at the request of defendant's attorney. Dr. Rothberg reviewed the arrest report and related documents describing the incident before examining defendant. Based on the incidents, he suspected defendant was not a person with a normal mental state. The interview was cut short when defendant got up and walked away. Dr. Rothberg concluded defendant was mentally ill because of the facts of the incident, which the doctor labeled as deranged and unusual behavior. At the time of the interview, defendant was not taking any psychotropic medications.

Dr. Rothberg believed defendant was suffering from psychosis on the day of his arrest. Psychosis is a major medical disorder characterized by being out of touch with reality. Dr. Rothberg believed defendant was not processing all incoming information and thus did not understand everything that was happening. His memory may have failed, making it hard for him to remember what had happened. Defendant also could have been suffering from schizophrenia. Dr. Rothberg did not believe defendant was lying or malingering about his mental state, especially since defendant insisted he was not mentally ill.

Dr. Rothberg stated that symptoms of psychosis are not always visible. Some of his psychotic patients are able to work and engage in daily life. Medication helps these patients function. Dr. Rothberg's subsequent examinations of defendant on October 16, 2009; September 2, 2010; and February 10, 2012; reaffirmed his opinion that defendant's actions were a result of his mental illness.

Dr. Rothberg stated that his opinion would not change even if defendant had been under the influence of methamphetamine at the time of the incidents. He asserted that the

6

cause of defendant's state was not the relevant question. He acknowledged that defendant's behavior was possibly affected by methamphetamine use. He did not believe defendant suffered from a methamphetamine-induced psychosis because defendant's condition was now permanent. When Dr. Rothberg saw defendant again in 2009, he was "very illogical" when the doctor attempted to discuss all aspects of the case. Defendant's planning and view of the evidence against him were quite irrational, which suggested to Dr. Rothberg that defendant was still delusional.

Defendant testified on his own behalf. He chose to testify in English. He used an interpreter to interpret the questions from English into Tagalog. Defendant said he had waited a long time for his trial and had insisted on testifying.

Defendant was most recently employed as a bill collector for the gas company. He lost his job on October 25, 2008, because he stopped going to work. Defendant stated that the man who testified to being his mailman was not his mailman, and not the mailman he argued with. He did not hit any mailman on the date in question. He did not use methamphetamine on that day. He did not like the mailman's tone of voice and that was why he argued with him.

Defendant testified that he had never seen Officer Guillen or Officer Bua before, apart from in court. It was unbelievable that defendant would turn his back on an officer who pulled a gun on him. The officers were part of the Rampart police station, who had a "bad reputation," and would shoot an unarmed man.[3] Defendant denied masturbating in front of the police, threatening the police officers, saying he would kill himself, throwing objects down the stairs, setting fire to a mattress, and telling police his brother was the person who was involved in the incident. Defendant also denied having a knife. He said the police would have shot him if he had a knife.

---

[3]     The court overruled the prosecutor's objection to defendant's statement and denied his request to strike the statement about the Rampart police on the ground that it was nonresponsive to defense counsel's question. After the court called a recess, the prosecutor again objected and the court sustained the objection and struck the answer.

7

Defendant did not want to take Risperdal but the doctors forced him to take it. He did not suffer from a mental illness. Some fellow inmates told him that taking medication would not help his case. Two doctors told him he did not need it.

Defendant was aware that the police came to his apartment because of the argument with the mailman. When the police used tear gas, defendant tried to call 911, but his phone was not working. On the day of the incident, he was very sad because it was two days before the anniversary of his mother's death.

Defendant testified that police shot him three or four times with rubber bullets, broke a bone in his right forearm, broke six of his ribs, and used a taser on him twice. The police almost damaged his spinal cord. They put defendant on the ground and kicked him all over his body.

### C. Prosecution Rebuttal Evidence

Los Angeles paramedic Joshua Perelliminetti treated defendant at the scene. Defendant was alert and oriented. He said he did not know why he had done it. He did not know why so many police officers were outside his apartment, and he was scared when they came. He had a large hematoma on his right forearm and impact wounds on his left clavicle and left armpit area. He had abrasions to the tops of both hands. There were some signs of a possible fracture of the ribs under his right armpit. He did not appear to have any spinal cord injuries.

Defendant's supervisor in 2008, Richard Lopez, testified that defendant worked as a field collector. He went to customers' homes to collect overdue bills. Defendant did not give bizarre answers to questions, but "there was a bit of a struggle with not only speaking [English], but understanding it." He was a very nice guy and really quiet—perhaps a bit socially awkward. Defendant was absent for some personal business and never returned to work. He was terminated for desertion of his position. He never showed signs of aggression or of using illegal drugs while on the job. Lopez was shocked when he learned about the incident.

8

## II.  Facts Regarding Defendant's Competency

Defendant was arraigned on October 24, 2008, and the court appointed the public defender to represent him.  Prior to the preliminary hearing on December 11, 2008, defendant's counsel declared a doubt regarding defendant's competence, and the proceedings were adjourned.  The court ordered defendant to undergo an examination pursuant to section 1368.

Dr. Sanjay M. Sahgal, a forensic psychiatrist, submitted a report to the court stating that defendant appeared to have a psychotic disorder and made statements suggestive of delusional thinking.  He found defendant not competent to stand trial and said defendant would benefit from antipsychotic medication, which would likely make him competent to stand trial.  Upon receipt of the report on January 29, 2009, the court found defendant mentally incompetent and ordered him committed to Patton State Hospital.  The court found it appropriate to treat defendant with psychotropic medication.

On June 1, 2009, defendant was found competent within the meaning of section 1368.  The preliminary hearing was continued several times, and on November 3, 2009, criminal proceedings were suspended when the court declared a doubt as to defendant's mental competence.

On December 11, 2009, Dr. Joseph R. Simpson, a forensic psychiatrist, submitted a report to the court.  He reviewed a psychiatric report by Dr. Jack Rothberg dated December 9, 2008 (not part of the record); a "short report" competence evaluation by Dr. S. Zahedi dated December 30, 2008 (not part of the record); the previously mentioned report by Dr. Sahgal, and a court report dated April 21, 2009, from Patton State Hospital (not part of the record).  Dr. Simpson believed the evidence was consistent with a psychotic episode that probably began before defendant's arrest and continued for several months.  Dr. Simpson believed that, at the time of his interview with defendant (November 30, 2009), defendant was not showing psychiatric symptoms to the degree that his trial competence was compromised.  Defendant was not taking psychiatric medication.  Defendant was able to identify and discuss the charges, possible penalties,

9

the plea options, the roles of courtroom personnel, and the rules of courtroom behavior. Dr. Simpson concluded defendant was competent to stand trial.

Dr. Simpson's report noted that Dr. Zahedi had contacted defendant's daughter, who reported that defendant "had a significant history with methamphetamine and 'crack' cocaine and 'is often preoccupied with the mailman stealing his mail.'" The report also stated that defendant "was given a diagnosis of Amphetamine Dependence and Delusional Disorder." The Patton report stated that defendant had "prior arrests for manufacturing methamphetamine and for being under the influence of a controlled substance." On December 15, 2009, the court found defendant competent to stand trial and reinstated criminal proceedings.

Defendant's preliminary hearing was held on February 11, 2010, and he was held to answer. On February 25, 2010, he pleaded not guilty to all counts and denied the allegations.

Several continuances were granted to the defense, and on September 10, 2010, defense counsel requested another continuance. She was awaiting an evaluation from a confidentially appointed expert, and her trial preparations were not complete. At the next proceeding on October 4, 2010, defense counsel declared a doubt and criminal proceedings were adjourned. She explained that her expert, Dr. Jack Rothberg, strongly believed defendant was not competent.

Dr. Rothberg was appointed to examine defendant under Evidence Code section 730.[4] On November 18, 2010, both parties submitted on Dr. Rothberg's report, and defendant was ordered to be transported to Patton for evaluation and generation of a report. On February 22, 2011, the court stated that a certificate of mental competence had been received from Patton State Hospital.

---

[4]     Evidence Code section 730 provides for the appointment of experts by the court to investigate, report, and testify, and it allows the court to fix the compensation for these services.

10

On March 21, 2011, criminal proceedings were reinstated. The prosecutor advised the court that defendant had refused an offer of eight years and eight months and wanted to go to trial.

On May 5, 2011, defense counsel told the court that defendant would not cooperate with her. After an ex parte hearing, the court accepted the declaration of doubt and suspended criminal proceedings. The court also denied defendant's *Marsden* motion.[5]

On September 15, 2011, the parties submitted on a report by Dr. Stephen Mohaupt, who found defendant to be competent. Criminal proceedings were reinstated.

At the next proceeding on December 8, 2011, defense counsel declared a doubt regarding defendant's competency. She said she was still having difficulty communicating with him. Based on counsel's statements, the court found there existed a doubt as to defendant's competency and suspended criminal proceedings. On March 8, 2012, the court received a report from the People's expert, Dr. Mohaupt, indicating that defendant was competent. The report of the defense expert, Dr. Rothberg, reached the opposite conclusion. A third expert was appointed as a tiebreaker. On April 19, 2012, both counsel submitted on Dr. Knapke's report stating that defendant was competent to stand trial. Criminal proceedings were reinstated.

A settlement discussion was held on June 7, 2012. Defendant rejected the People's offer. Trial was set for June 18, 2012. On June 15, 2012, defense counsel filed a motion to continue on the ground that she intended to declare a doubt pursuant to section 1368. She stated that defendant would not speak with her about any subject concerning his trial.

On June 18, 2012, defendant again declined the People's offer. Judge Monica Bachner began voir dire. Voir dire continued on June 19, 2012. After the noon recess, defense counsel declared a doubt about defendant's competency. The court held an

---

[5]     *People v. Marsden* (1970) 2 Cal.3d 118.

ex parte hearing. The court stated it did not appear that defendant was incompetent, and proceedings were not suspended.

## DISCUSSION

**I.     Trial Court's Refusal to Adjourn Jury Trial to Address Defendant's Competence**

### A. *Defendant's Argument*

Defendant contends that, given the history of his case, reversal is required because the trial court refused to "implement procedures designed to consider [defendant's] clearly delusional state" when defense counsel expressed her doubt that defendant was mentally competent on the second day of jury selection. The trial court incorrectly ruled that the issue had already been litigated instead of conducting a proper inquiry into the new factual allegations. The trial court also incorrectly labeled defendant's delusion as a disagreement with counsel rather than recognizing that his delusional beliefs prevented him from having a sufficient present ability to consult with counsel with a reasonable degree of factual understanding. According to defendant, the trial court's failure to initiate proceedings to determine competence violated his federal due process rights, the California Constitution, and section 1368.

### B. *Proceedings Below*

As noted, prior to trial, defense counsel filed a motion to continue. She stated she intended to declare a doubt pursuant to section 1368 on the day set for trial (June 18, 2012), because defendant would not speak with her about any subject concerning his trial. On that day, the case was ordered transferred to Department 124 for trial. On June 19, the second day of voir dire, defense counsel expressed a doubt as to defendant's competency. She said that defendant had walked out on her when she attempted to discuss the usual topics she would discuss with a defendant on the eve of jury trial. She had also attempted a discussion with him that morning and concluded he was not able to rationally cooperate with her. Although he was "very linear" and had a grasp of dates, he had no ability to make knowing and informed decisions.

12

The court inquired if there was something new, or whether counsel was repeating what she had expressed previously. Counsel appeared to indicate there were new developments and she wanted to discuss the matter ex parte. The court agreed to take an ex parte offer of proof and look at the previous minutes and the reports to determine what the appropriate inquiry would be. Counsel explained that Dr. Knapke's report had been a tiebreaker previously, and counsel did not agree with his report finding defendant competent. The court said it need to see "what is new." The parties provided the court with copies of several reports, including the ones establishing the most recent competency, and an ex parte hearing was held.

The court heard from defense counsel that on the day she filed the continuance motion, defendant had walked out on their video conference when she attempted to discuss their defense, prompting her to file the motion. On the current day (June 19), he had insisted that the mail carrier in the case was not his regular mail carrier, and he denied everything he was accused of doing. He also complained that defense counsel had told him there was a video of the incidents but had never shown it to him. Counsel believed defendant's level of denial was "clinical," and a product of mental illness and a "fixed delusion system." The court then asked defendant some questions regarding where he was, what they were doing, and what he was wearing. Defendant answered appropriately. He knew the room number where they were located, that they were picking a jury, and that he was not wearing jail clothes. When asked if he had had an opportunity to talk to his attorney, defendant replied, "Yeah, this morning. How come she say I'm lying? He just said it." The court said, "I've heard enough. . . . I don't hear that there are any new facts. I don't believe there is any showing that Mr. Ramos is incompetent. This doesn't appear to be anything new. I'm talking to him. He's choosing to speak in English. He's rational. He understands what's going on. There might be a disagreement between counsel and the defendant. This happens all the time. That doesn't mean he is incompetent to stand trial. This hearing is finished."

Upon returning to the courtroom, the court stated, "I have heard the offer of proof. I have spoken directly with the defendant. Doesn't appear to me—there doesn't appear

13

to me to be new information. Moreover, it doesn't appear to me that he's incompetent. He knows who he is. We had a rational discussion regarding the proceeding, what was going on. I believe I indicated there does appear to be almost like a strategic conflict between the parties, but that's not incompetent. So at this point, I've heard defense counsel say that she has a doubt, but the court does not have a doubt. I'm not suspending proceedings."

### C. Relevant Authority

"A person cannot be tried or adjudged to punishment while that person is mentally incompetent." (§ 1367, subd. (a); see also *Drope v. Missouri* (1975) 420 U.S. 162, 172.) "If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369.[6] If counsel informs the court that he or she believes the defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall be held in the superior court." (§ 1368, subd. (b).)

"Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent. [Citations.] A defendant is incompetent to stand trial if he or she lacks a "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . a rational as well as a factual understanding of the proceedings against him.'" [Citations.] [¶] Both federal due process and state law require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning

---

[6] Section 1368.1 provides for the filing of a demurrer or a motion to dismiss the complaint. Section 1369 prescribes the order of proceedings in a trial on the issue of mental competence, which begins with the appointment by the court of one or more psychiatrists or licensed psychologists to examine the defendant.

14

the defendant's competence to stand trial. [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 846-847 (*Rogers*).)

Our Supreme Court has given the following standard for determining substantial evidence of incompetency from mental illness based upon expert opinion: "'If a psychiatrist or qualified psychologist [citation], who has had sufficient opportunity to examine the accused, states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel, the substantial-evidence test is satisfied.'" (*People v. Welch* (1999) 20 Cal.4th 701, 738, quoting *People v. Pennington* (1967) 66 Cal.2d 508, 519.) "Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations. [Citations.] But to be entitled to a competency hearing, 'a defendant must exhibit more than . . . a preexisting psychiatric condition that has little bearing on the question . . . whether the defendant can assist his defense counsel.' [Citation.]" (*Rogers*, *supra*, 39 Cal.4th at p. 847.)

"Absent substantial evidence of a defendant's incompetence, 'the decision to order [a competency hearing pursuant to section 1368] [is] left to the court's discretion.'" (*People v. Panah* (2005) 35 Cal.4th 395, 432.) A court abuses its discretion only if its ruling falls outside the bounds of reason (*People v. Ochoa* (1998) 19 Cal.4th 353, 408), and "[a] trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial. [Citations.] The failure to declare a doubt and conduct a hearing when there is substantial evidence of incompetence, however, requires reversal of the judgment of conviction. [Citations.]" (*Rogers*, *supra*, 39 Cal.4th at p. 847.)

Once a competency hearing has been held and defendant has been found competent to stand trial, however, the "trial court is not required to conduct a second competency hearing unless 'it "is presented with a substantial change of circumstances or with new evidence"'" that gives rise to a 'serious doubt' about the validity of the

15

competency finding. [Citation.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 33; *People v. Medina* (1995) 11 Cal.4th 694, 734.) The appellate court gives great deference to the trial court's decision whether to hold a second competency hearing. (*People v. Marshall*, at p. 33.) It is in no position to appraise factors such as defendant's conduct and demeanor in the courtroom. (*Ibid*.)

### D. Analysis

The record shows that the trial court found there was no new information to support defense counsel's declaration of a doubt. The last report on defendant's mental state was done by Dr. Knapke on April 14, 2012, and both parties submitted on that report, which the court ordered as a "tiebreaker" after Doctors Rothberg and Mohaupt submitted opposing opinions. On that basis, proceedings against defendant were reinstated. The trial court considered this report along with Dr. Rothberg's and Dr. Mohaupt's reports in making its ruling on June 19, 2012.

In his report, Dr. Knapke stated that he had reviewed the arrest reports, a report from Patton State Hospital, four reports from Dr. Rothberg, and two from Dr. Mohaupt. Dr. Knapke found no clinical evidence of any major mental illness or disorder. Defendant was not psychotic and showed no symptoms of psychiatric illness, even though he was not taking any psychiatric medication. He was calm and cooperative and answered all questions in a rational manner. He clearly understood the charges against him and the proceedings. He demonstrated the capacity to rationally cooperate with his attorney if he chose to do so. The doctor stated that defendant's decision to take his case to trial was not based on delusion. Defendant believed he was unjustly treated by law enforcement and that he was not guilty of the charges against him. He wanted to prove his innocence despite the possibility of a long prison sentence.

Dr. Knapke stated that "there is documentation" that the defendant had a history of methamphetamine abuse. Defendant told Dr. Knapke that he abused methamphetamine in the 1990's, but he said he had not used it since then. Dr. Sahgal reported, however, that defendant told him he had been abusing methamphetamine for many years but stopped "some indeterminate time ago." In his December 2009 report, Dr. Simpson

16

reported that defendant was given diagnoses of Amphetamine Dependence and Delusional Disorder at Patton State Hospital. Dr. Simpson stated that defendant had a psychotic episode that was very likely caused by, or significantly exacerbated by, the use of methamphetamine. Dr. Mohaupt noted in his January 2012 report that Patton State Hospital stated that defendant's delusions, bizarre behavior, violence, and disorganized thinking appeared to have been precipitated by intoxication with methamphetamine. Dr. Mohaupt believed that if defendant was intoxicated on amphetamines at the time of the offenses, it was possible he did not accurately recall the events, which might be a contributing factor in his "rigid and stubborn approach to his case." He added that any such memory impairment was not likely to improve.

According to Dr. Knapke, "when individuals abuse methamphetamine, they can develop psychotic symptoms that can mimic the psychotic symptoms that we frequently see in major mental illnesses such as schizophrenia. For example, individuals who are acutely intoxicated on methamphetamine can become highly paranoid, delusional, and can also become hypersexual during their intoxication. Once the drug has cleared from the individual's system, the individual can then return to a non-psychotic baseline functioning."

Dr. Knapke reviewed Dr. Rothberg's reports and stated that Dr. Rothberg's opinion that defendant was incompetent to stand trial was based primarily on the fact that he believed the defendant had little chance of prevailing at trial if he continued to insist he was not guilty of the charges. Dr. Mohaupt also noted defendant's stubbornness regarding his approach to the case but found no evidence that a mental health disorder was interfering with defendant's judgment. Dr. Mohaupt reported that defendant was aware that if he lost his case he potentially faced a life sentence.

Dr. Knapke noted that defendant had displayed no evidence of ongoing psychosis in February 2011. His thoughts were linear and coherent and he was cooperative. He wished to return to court to fight the charges and said he would cooperate with his attorney. Notably, defendant was able to list all of the charges against him and the four possible pleas to the charges for Dr. Knapke. He was able to define the roles of the

17

public defender, prosecutor, and judge, and the jury.  Dr. Knapke reported:  "When asked what he is being charged with defendant states, 'Three counts of attempted murder, four counts of assault of a police officer, one count of arson, and one count of an assault on a mailman.'  When asked to name the four possible pleas [in] court, he rattled off, with no difficulty, 'Not guilty, guilty, no contest, and not guilty by reason of insanity.'  When asked to differentiate between the roles of a public defender versus a district attorney, he once again spontaneously stated, 'The public defender defends me on my case and the district attorney represents the state and is against me.'  When asked to describe what a jury is he said, 'Twelve people from the community who will find me either guilty or not guilty of the crime.'  When asked what the role of the judge is he indicated that the judge can also determine whether he is guilty or not guilty and is the referee of the courtroom."  Defendant presented himself "extremely well" and was able to answer the questions posed to him in a "completely rational manner" devoid of delusions.

Given the observations of Dr. Knapke, who acted as a tiebreaker on the issue of competence, we believe the trial court was not obliged to declare a doubt and hold a full hearing because there was no substantial evidence of any changes in defendant's conduct or beliefs so as to create a reasonable doubt that defendant was incompetent.  (*People v. Hayes* (1999) 21 Cal.4th 1211, 1281 [evidence regarding past events that merely provides basis for speculation regarding current incompetence is not enough].)  The trial court properly assessed defendant's behavior and concluded there had been no new conduct that demonstrated he was incompetent to stand trial.  More than the odd incident of bizarre conduct or statements, or statements of defense counsel that defendant cannot cooperate in his defense is required before a court can be deemed to have abused its discretion by not declaring a doubt about a defendant's competence.  (*People v. Welch*, *supra*, 20 Cal.4th at p. 742.)  At various times, defendant demonstrated that he knew he was facing a life sentence.  His attorney's principal complaint appeared to be that he insisted on a trial, which required her "to try to figure out some defense."  Dr. Knapke recognized that, although this stance might be "problematic" for others, this decision was not based on delusion.  Defendant gave Dr. Knapke "a very logical and coherent reason

18

as to why he wants to fight his case" at trial, and defendant was fully aware of the consequences. Defendant's position simply had not changed in the two months between Knapke's interview with him and voir dire. Counsel also noted that defendant was not getting antipsychotic medications as Dr. Rothberg believed he required. However, Dr. Knapke's interview occurred after defendant had stopped taking these medications, and defendant was very coherent at that time. The trial court stated that her conversation with defendant indicated he knew very well what was going on and merely seemed frustrated.

Defendant disagrees and notes that defendant insisted that the mail carrier who testified against him was not his regular mail carrier. He points out that after the mailman testified, defendant offered to plead guilty and take the maximum sentence on the condition that if the defense proved the mail carrier was lying, he would get out of jail. Defendant himself twice told the court that the mailman on the stand was not the one with whom he argued. According to defendant, this shows that the trial court failed to consider indisputable and specific new evidence that defendant was not competent. Defendant also contends that defendant's testimony put to rest any doubts that he was delusional. In his testimony, he repeated his assertion that the mailman who testified was not the one he argued with. Defendant also points to his assertion that he did not set fire to the mattress, and that there was a videotape of the entire incident as evidence of delusions.

Defendant's testimony occurred after the trial court's ruling that there was nothing new. We review the state of the evidence at the time the trial court's ruling was made. (*People v. Welch*, *supra*, 20 Cal.4th at p. 739.) We reiterate that "once a defendant has been found to be competent, even bizarre statements and actions are not enough to require a further inquiry." (*People v. Marks* (2003) 31 Cal.4th 197, 220; *People v. Ramos* (2004) 34 Cal.4th 494, 508.) Defendant's statements and testimony reveal an iron-willed stubbornness and a tendency to latch on to an idea and relentlessly pursue it, but they do not appear delusional. Since defendant clearly believed that law enforcement had treated him unjustly, it is not inconceivable that he could believe an imposter mail carrier was

19

put on the stand. Given the degree of force used against him, he may have believed he could convince the jury he was a victim of excessive force, since he was alone and unarmed except for household knives. Defendant lived in the area of the Rampart police station, which had been the subject of investigation for police corruption a few years earlier—a scandal that was widely known and that made the Rampart name almost synonymous with police corruption. Defendant himself mentioned it during his testimony.[7]

Defendant also argues that although the courts of this state have approved deferential review of the trial court's decision whether to declare a doubt, given the compelling evidence that defendant's due process rights were violated, the de novo standard approved by the United States Supreme Court is appropriate in this case. (*Drope v. Missouri*, *supra*, 420 U.S. at pp. 174-175.)

As noted, "[b]oth federal due process and state law require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial." (*Rogers*, *supra*, 39 Cal.4th at p. 847.) Thus, the federal and state standards of review are essentially the same. (*People v. Lightsey* (2012) 54 Cal.4th 668, 690-691.) We conclude that the trial court did not err in finding a lack of substantial evidence of changed circumstances that would justify declaring a doubt about defendant's mental competence and suspending criminal proceedings.

## II. Defendant's Competence

### A. Defendant's Argument

Defendant argues that his trial testimony was so at odds with reality that it demonstrated he was not competent. Defendant points to his denials of virtually all of the

---

[7] As noted, this part of defendant's testimony was ultimately stricken, but the ruling to strike the testimony came some time after the jury had heard it and after the jury had left the courtroom.

acts that led to his criminal charges. He asserts that his testimony was "incomprehensible" at times, and he was unable to give responses to direct questions. According to defendant, these facts demonstrated a complete absence of the criteria required to find him competent, i.e., the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense.

### B. Relevant Authority

"The court's duty to conduct a competency hearing may arise at any time prior to judgment. [Citation.]" (*Rogers*, *supra*, 39 Cal.4th at pp. 846-847.) "[U]pon the presentation of substantial evidence showing a substantial change of circumstances or new evidence giving rise to a serious doubt about the validity of the original competency finding, regardless of the presence of conflicting evidence, the trial court must hold a subsequent competency hearing. This substantial evidence standard of proof is the same standard applied by the trial court in determining whether an original competency hearing should be held. [Citation.]" (*People v. Kaplan* (2007) 149 Cal.App.4th 372, 376, 384.)

### C. Analysis

In support of his argument that he was indeed incompetent, defendant points to portions of his trial testimony. For example, when his attorney asked him if he threw anything down the stairs when the police were entering, such as a vacuum cleaner or a box, defendant answered, "No, ma'am. If I throw one, they can see my fingerprints. So bring in the one that throw it, I throw the knife. They say I throw knife. If I throw knife, they're going to shoot me with real bullet." Defendant also denied throwing marbles, a vacuum cleaner, and a box or speaker.

Defendant maintains that his testimony was at times incomprehensible and quotes the following passage:

"Q: Why were you worried that the mailman was going to call the police if you hadn't hit him?

"A: No, I'm not worried. Because I'm going to wait outside if you're going to call "the police, if I can explain it.

21

"Q: What were you going to explain?

"A: That I thought it was junk mail.

"Q: So you thought that the Korean mailman would call the police, because you "threw your mail in the grass?

"A: No, I threw—No, I throw it in the trash. We got argument—we got argument that somewhere I don't like it. Why you do that. I said that's the way it happened.

"Q: So you had a fight about, in the trash, you threw your mail in the trash?

"A: No."

He also cites the following as an example of his inability to logically answer a question:

"Q: Did you have any close friends at work?

"A: Yes, but in other place, not in base.

"Q: I'm not understanding that.

"A: Deeper in base. Gas Company is all over California."

According to defendant, his testimony reveals a total absence of any understanding of the proceedings. In addition to being unable to give responses to direct questions, the answers he did give showed beliefs that were not connected to reality.

We disagree. We note that defendant's supervisor, Lopez, believed defendant struggled with both speaking and understanding English and stated "he was a little hard to get through to."[8] Defendant could not grasp company policy. He could not "get his message across" to customers, and they complained that what he told them was "unclear." They did not "understand what he was trying to say." Lopez stated that "the communication was really, really limited." We believe that what is reflected in defendant's testimony is an inability to express himself in English using the proper syntax and verb tenses, perhaps because he translates from his first language. Moreover, because defendant had "accented speech," as reported by Dr. Simpson, it is likely that the

---

[8]    As noted, the court provided defendant with a Tagalog interpreter who interpreted the questions posed to him, but defendant chose to answer the questions in English.

court reporter may have misunderstood the occasional word. An incorrect word can transform a sentence that is poorly constructed into one that appears nonsensical.

As for his denial of all of his actions during the incident with the mailman and SWAT team, we have already stated that we do not believe this signifies defendant was incompetent to stand trial. It is true he insisted Nguyen was not the mailman with whom he argued. He said his mailman was Korean rather than Vietnamese. He did not deny arguing with the mailman, however, although he denied hitting him. He denied having a knife and swinging it. He said it was unbelievable that he would turn around and walk back into the building when the policeman pointed a gun at him "because even you don't have a gun, Rampart police, they have a bad reputation. Even you don't have a gun, they're going to shoot you." This explanation is not incoherent. As for the purportedly bizarre act of ordering Thai food during the standoff, defendant said he ordered Thai food immediately upon returning to his apartment after his encounter with the plain-clothed officer, because it was between 11:00 and 12:00, and he was hungry. He denied saying he was going to "kill you all."

Throughout this questioning regarding the events of the day, defendant answered coherently—he merely denied everything. He said that the police came because he argued with the mailman, and he had a standoff with them for seven hours. The exchange in which defendant said he had friends "deeper in base" went on to reveal he had friends "in other locations," like "Canoga. Hollywood." Where he worked most recently, "we just talk about the work." Defendant's answers to these questions made perfect sense, contrary to his suggestions on appeal. Sometimes he is difficult to understand because of his manner of speaking, but the record does not reflect he was delusional. Dr. Knapke noted that the state hospital's court report dated February 4, 2011, revealed that "'[s]tatements previously interpreted as perhaps delusional have been repeatedly clarified by Mr. Ramos in a way that seems reasonable, logical, and consistent. Mr. Ramos thought processes are overall linear and coherent.'"

Given defendant's demeanor, such as it can be gleaned from the cold record, and his logical, although not smooth, responses to questioning, we believe the trial court did

23

not err or abuse its discretion in failing to declare a doubt about defendant's competency either at counsel's declaration of a doubt on June 14, 2012, or at any other time during trial.

## III. Reversal for Retrial Versus Retrospective Competency Hearing

### A. *Defendant's Argument*

Defendant contends that the trial court's failure to hold a competency hearing requires reversal of the judgment, and the case must be remanded for retrial, assuming he is competent at the time of such trial. In anticipation of an argument by respondent that the matter should be conditionally reversed for a retrospective determination of competence if this court agrees with defendant's arguments, defendant argues that a concurrent determination is needed, citing *Pate v. Robinson* (1966) 383 U.S. 375, 387. Because we find the trial court did not err or abuse its discretion in finding a lack of substantial evidence of new circumstances justifying a finding of incompetence, we need not address the feasibility of a limited remand in this case for the purpose of a retrospective competency hearing. (See *People v. Lightsey*, *supra*, 54 Cal.4th at pp. 705-711.)

## IV. Defendant's Ability to Evaluate Plea Offer

### A. *Defendant's Argument*

Defendant contends that, given that our justice system is a system largely of pleas (*Missouri v. Frye* (2012) ___ U.S. ___, ___ [132 S.Ct. 1399, 1407]), due process requires that the accused be competent to evaluate a proposed plea agreement. Due to his psychosis, defendant argues, he was in no position to understand the required components of a plea disposition. Under these circumstances, it was offensive to fundamental fairness that he was forced to trial and given a life sentence.

### B. *Relevant Authority*

A defendant must have "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him'" in order to be deemed competent

to plead guilty. (*Dusky v. United States* (1960) 362 U.S. 402 (*Dusky*); accord, *Drope v. Missouri*, *supra*, 420 U.S. at p. 171.)

### C. Analysis

Defendant contends that the *Dusky* standard of assessing a defendant's competence to plead guilty must be applied to determine whether defendant was rationally able to understand the offer from the prosecution.

In support of his claims that he was incapable of understanding the plea offer, defendant quotes from an exchange with Judge Lomeli during a pretrial proceeding:

"Court: Why don't you explain it to me, what happens [at trial]?

"[Appellant]: If I lost, I take, for example, they give me eight—they offered me eight years, maybe they triple it.

"Court: No. It won't be tripled. If you lose, you get life term.

"[Appellant]: Yeah, I know.

"Court: That's not tripled. You go to life.

"[Appellant]: Because they say to life, also, before.

"Court: Yeah, that's right. Fifteen to life, yeah, several times.

"[Appellant]: Okay."

According to defendant, his response of "okay" when the trial court told him he would get several life terms falls far short of the competence required to evaluate the plea bargain he was offered. Defendant also notes that, soon thereafter, the following exchange occurred when he complained about his attorney.

"Court: So what is [*sic*] your attorney done wrong? I've yet to hear anything.

"[Appellant]: "The last time, they say they can wear high heel to go to trial.

"Court: Wear high heels?

"[Appellant]: Yeah, that's what she say.

"Court: That she can wear high heels?

"[Appellant]: Yeah, she say last time. That's it.

"Court: So what does that mean, sir? I don't understand.

"[Appellant]: I don't understand. She say she injured. She can wear high heels in a trial.

"Court: And what's wrong with high heels?

"[Appellant]: I don't know why they want to go to trial."

We observe that on the day of this colloquy, May 5, 2011, Judge Lomeli accepted counsel's declaration of doubt and suspended criminal proceedings. Judge Lomeli ordered an evaluation. At the next proceeding, the court stated that Dr. Mohaupt had evaluated defendant and found him competent. Thus, despite the portions of the record defendant cites, defendant was found competent to stand trial shortly thereafter. After defense counsel again declared a doubt because of defendant's insistence upon going to trial, which was accepted by Judge Ohta despite defendant's protests, the reports from Dr. Rothberg and Dr. Mohaupt were obtained, and ultimately the report from Dr. Knapke that showed defendant understood the concept of the plea bargain and the consequences of going to trial. The record indicates that defendant was informed of the plea offer again at the start of trial. Once again, "[e]vidence regarding past events that does no more than form the basis for speculation regarding possible current incompetence is not sufficient." (*People v. Hayes*, *supra*, 21 Cal.4th at p. 1281.)

We have already determined that defendant was competent to stand trial, and that the trial court did not abuse its discretion or err in not declaring a doubt and holding yet another competency hearing after trial began. Dr. Knapke's report is significant in that it reveals defendant was well aware of the offer made to him and the potential sentence he faced. Dr. Knapke reported that defendant wanted a jury trial in order to fight the charges against him. When asked to define a plea bargain, defendant said, "'It's when I plead no contest to a lesser charge in order to get less time.'" When asked what he could be facing if found guilty of the charges against him "he spontaneously stated, 'Twenty-five years to life in prison.'" When asked if he had been offered a plea bargain, he replied, "'They offered me eight years in prison on September 5, 2011.'" Defendant said he did not plan on accepting this plea bargain.

26

While defendant was explaining this, Dr. Knapke found that defendant's thoughts were logical and rational and void of delusions. Dr. Knapke concluded that "Even though his decision to move forward with his case in a jury trial may not represent good judgment, considering the fact that he is potentially facing a very long prison sentence if convicted, he believes it is his constitutional right to fight his case in a trial. He believes he is not guilty of the charges against him. He believes that he is being treated unfairly by law enforcement and wants to have his day in court. This is not a delusion. Even though the defendant may not want to proceed with his legal case in the fashion that his public defender advises him to do, he is not psychotic" Dr. Knapke further stated that defendant had "the capacity to rationally cooperate with his attorney if he so chooses."

There is a difference between a defendant being unable to cooperate with his counsel and refusing to do so. (*People v. Marks* (2003) 31 Cal.4th 197, 220.) Even a defendant's assertion that he wishes the death penalty "does not alone amount to substantial evidence of incompetence or evidence requiring the court to order an independent psychiatric evaluation." (*People v. Ramos*, *supra*, 34 Cal.4th at p. 509.)

It is true that plea bargaining is a critical stage of trial proceedings. (*Missouri v. Frye*, *supra*, ___ U.S. at p. ___ [132 S.Ct. at p. 1407].) As such, there is no significant difference in the evaluation of a defendant's competency to stand trial versus his competency to assess a plea offer from the prosecution. (*Godinez v. Moran* (1993) 509 U.S. 389, 399, [the same level of competence is required for one who chooses to plead not guilty as for one who pleads guilty].) Although the decision to plead guilty is "undeniably a profound one, it is no more complicated than the sum total of decisions that a defendant may be called upon to make during the course of a trial." (*Id.* at p. 398.)

Moreover, defendant's claim is largely speculative in that there is no way of knowing if he would have been found incompetent to stand trial had he been examined yet again by another psychiatrist or if he would have accepted the plea bargain after another examination or possible treatment at Patton. (See *People v. Bell* (2010) 181 Cal.App.4th 1071, 1087.) The record indicates that defendant's steadfast insistence on going to trial was not the result of psychosis or delusions. We conclude defendant

27

suffered no violation of due process because of the trial court's alleged failure to declare a doubt as to his competency.

## V. Deadly Weapon Use Enhancements

### A. Defendant's Argument

Defendant contends that the consecutive one-year terms for the dangerous or deadly weapon enhancements under section 12022, subdivision (b)(1) must be stricken from the judgment in counts 2, 4, 6, and 7 (assault with a deadly weapon on a peace officer) and in count 8 (assault with a deadly weapon on Nguyen). He argues that the use of a weapon is an element of these offenses. Respondent agrees.

### B. Relevant Authority

"[A] deadly weapon use enhancement under section 12022, subdivision (b) cannot be imposed when use of a deadly weapon is an element of the offense of which an accused is convicted." (*People v. McGee* (1993) 15 Cal.App.4th 107, 113 (*McGee*).) "[I]n determining whether use of a deadly weapon other than a firearm is an element of a section 245, subdivision (a)(1) conviction, the question is not simply whether, in the abstract, the section can be violated without using such a weapon. Rather, the conduct of the accused, i.e., the means by which he or she violated the statute, must be considered." (*Id*. at p. 115.)

At the time of the charged offenses, section 245, subdivision (a)(1), provided: "Any person who commits an assault upon the person of another *with a deadly weapon or instrument other than a firearm* or by means of force likely to produce great bodily injury, shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment." (Stats, 2004, ch. 494, § 1, italics added.)

Section 245, subdivision (c), provides: "Any person who commits an assault *with a deadly weapon or instrument, other than a firearm,* or by any means likely to produce great bodily injury upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the

28

performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for three, four, or five years."

Section 12022, subdivision(b)(1), provides: "A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, *unless use of a deadly or dangerous weapon is an element of that offense.*" (Italics added.)[9]

### C. Analysis

In the instant case, the prosecution alleged that defendant used a knife in counts 2, 4, 6, and 7, and that he used a rock in count 8. The jury found these allegations true in each of these counts. Like the statute at issue in *McGee*, the statutes violated by defendant could be violated in two ways, and in one of those ways, weapon use was an element. (See *People v. Chaffer* (2003) 111 Cal.App.4th 1037, 1043.) Therefore, defendant's use of a knife or rock was an element of the offenses in these counts and not an additional factor worthy of an enhancement. Therefore, the trial court was not authorized to impose the enhancements for use of a deadly weapon under section 12022, subdivision (b) in these counts, and they must be stricken.

---

[9] Sections 245, subdivision (c) and 12022, subdivision (a)(1) have not changed since 2008.

## DISPOSITION

The judgment is modified to strike the one-year enhancements under section 12022, subdivision (b)(1) in counts 2, 4, 6, 7, and 8.  In all other respects the judgment is affirmed.  The superior court is directed to amend the abstract of judgment accordingly and to forward an amended copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


FERNS, J.*

_____
*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

30